# United States Court of Appeals
## For the First Circuit

No. 24-1524

UNITED STATES,

Appellee,

v.

REY DAVID FULCAR,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Barron, Chief Judge,
Kayatta and Rikelman, Circuit Judges.

Inga L. Parsons for appellant.
Alexia R. De Vincentis, Assistant United States
Attorney, with whom Leah B. Foley, United States Attorney,
was on brief, for appellee.

July 6, 2026

**BARRON**, **Chief Judge**.  Rey David Fulcar ("Fulcar") challenges his three federal convictions, each of which resulted from his pleading guilty to the underlying charges.  He contends that his guilty pleas to two of the charged offenses -- one for being a prohibited person in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1) and one for possession with intent to distribute certain drugs in violation of 21 U.S.C. § 841(a)(1) -- must be vacated because those pleas were unknowing and involuntary.  He further argues that his firearm-possession conviction must be reversed because the Second Amendment to the United States Constitution bars it.  In addition, Fulcar contends that his sentences for his three federal convictions must be vacated because the District Court erred in subjecting him to three enhancements under the United States Sentencing Guidelines (hereinafter "the Guidelines").  Although we reject most of Fulcar's contentions, we conclude that it was error to apply one of these sentencing enhancements -- namely, the enhancement set forth in what is commonly referred to as the career offender guideline -- at his sentencing.  We nonetheless affirm his convictions and his sentences because we conclude that the error in subjecting him to that enhancement was harmless.

**I.**

On March 1, 2023, a grand jury sitting in the District of Massachusetts handed up an indictment that charged Fulcar with

- 2 -

three counts.  The first count charged him with being a prohibited person in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1).  The other two counts charged him with possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1).[1]  The first drug-related count was based on drugs that were found on Fulcar during his arrest in Boston.  The second drug-related count was based on drugs that were found in Fulcar's home while it was being searched.

On July 3, 2023, Fulcar moved to suppress the evidence seized from his home, arguing that the search that led to the seizure violated the Fourth Amendment to the United States Constitution.  The District Court denied the motion after determining that the search was properly carried out pursuant to a valid search warrant and that, in any event, the officer executing the warrant acted in good-faith reliance on it.  See United States v. Leon, 468 U.S. 897, 922 (1984) ("Searches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." (citation modified)).

---

[1] The facts are stated as they appear in the record.  See United States v. McKinney, 5 F.4th 104, 106 n.1 (1st Cir. 2021) ("The facts that follow are taken from the record, particularly the indictment, plea agreement, presentence report, and sentencing hearing transcript." (citing United States v. Santa-Soler, 985 F.3d 93, 95 (1st Cir. 2021))).

Thereafter, Fulcar filed a motion to dismiss the firearm-related count. He did so on the ground that § 922(g)(1) violated the Second Amendment to the United States Constitution both on its face and as applied to him. The District Court denied the motion on October 27, 2023.

A little less than two months later, on December 20, 2023, Fulcar entered unconditional guilty pleas to all three counts in the indictment. The United States Office of Probation then prepared a Presentence Investigation Report ("PSR").

In calculating Fulcar's recommended sentencing range under the Guidelines for each of his convictions, the PSR applied certain Guidelines sentencing enhancements based on his offense conduct. Specifically, the PSR applied a four-level enhancement under § 2K2.1(b)(6)(B) of the Guidelines in determining Fulcar's total offense level for his § 922(g)(1) conviction. At the time of sentencing, that enhancement applied when the defendant "used or possessed any firearm or ammunition in connection with another felony offense." U.S. Sent'g Guidelines Manual § 2K2.1(b)(6)(B) (U.S. Sent'g Comm'n 2023) [hereinafter "U.S.S.G."].

The PSR also applied the enhancement under § 2K2.1(a)(2) to the § 922(g)(1) conviction. Section 2K2.1(a)(2) yields a base level of twenty-four for a conviction under 18 U.S.C. § 922(g)(1) when "the defendant committed any part of the instant offense

- 4 -

subsequent to sustaining at least two felony convictions of . . . a controlled substance offense." U.S.S.G. § 2K2.1(a)(2).

In addition, the PSR applied a four-level enhancement under § 4B1.1(b)(3) of the Guidelines -- which is commonly referred to as the career offender guideline. The PSR did so in determining Fulcar's total offense level for his two drug-related convictions.

The career offender guideline's enhancement applies if the defendant has two or more qualifying prior convictions. Id. § 4B1.1(a). That Guideline treats a prior conviction for a "controlled substance offense" as a qualifying conviction. Id.

Fulcar objected to the application of the enhancement in § 2K2.1(b)(6)(B) of the Guidelines on the grounds that he did not "'use or possess' the firearm/ammunition that was found inside a bin/container . . . in connection with another felony offense." Fulcar argued that the firearm in question was "kept inside [his] dwelling to protect him and his girlfriend at the time and not used in any way to facilitate the distribution of drugs."

Fulcar objected to the application of both § 2K2.1(a)(2) and § 4B1.1(b)(3) on the grounds that he only had one qualifying prior conviction, not two. Specifically, he objected to the PSR's treatment of his 2008 Massachusetts law conviction for the offense of possession with intent to distribute "cocaine" as a conviction for a "controlled substance offense."

The District Court rejected Fulcar's objection to the PSR's application of the career offender enhancement. It also determined that it did not need to rule on Fulcar's objection to the PSR's application of the enhancements under § 2K2.1(b)(6)(B) and § 2K2.1(a)(2) to his § 922(g)(1) conviction because, even if those enhancements did apply, they would not affect Fulcar's ultimate Guidelines sentencing range. That was so, according to the District Court, because Fulcar's three federal convictions had to be grouped under the Guidelines and his offense level for the two federal drug-related counts -- which was higher than even the enhanced total offense level for his conviction for the § 922(g)(1) offense -- drove the recommended sentencing range under the Guidelines for all his convictions. See U.S.S.G. §§ 3D1.2, 3D1.3. The District Court observed, however, that if it did have to reach the question of whether the firearm enhancement applied, then it "would have found . . . that it applied here."[2]

---

[2] The District Court did not explicitly address whether, in the absence of grouping, it would have found that U.S.S.G. § 2K2.1(a)(2) applied to Fulcar's firearm conviction under 18 U.S.C. § 922(g)(1). It is unclear whether this was intentional or due to a misunderstanding between the parties and the District Court. Nonetheless, as we will explain, the application of U.S.S.G. § 2K2.1(a)(2) -- through a cross-reference -- in this case depends on the application of U.S.S.G. § 4B1.1(b)(3), the career offender guideline. That is so because § 2K2.1(a)(2) applies when the defendant "committed any part of the instant offense subsequent to sustaining at least two felony convictions of either a crime of violence or a controlled substance offense." However, § 2K2.1 indicates in its application notes that

The District Court determined that the recommended sentencing range under the Guidelines for Fulcar's three federal convictions was 151 to 188 months of imprisonment. It ultimately imposed, however, a below-Guidelines sentence of 96 months of imprisonment.

In imposing that sentence, the District Court noted that "whether or not [it] had accepted [Fulcar's] arguments about what the advisory guideline sentencing range should be, that is, if [it] had accepted them, [it] would have still reached the same sentence [that it was] imposing [t]here, having considered all of the factors under Title 18, United States Code, 3553(a)." The District Court went on to explain that it would have done so because that sentence was "a sufficient and reasonable sentence given all of the sentencing factors, but not greater than necessary, to achieve all of the goals of sentencing" that it had reviewed.

---

"controlled substance offense" is defined in the same way it is defined in the career offender guideline. U.S.S.G. § 2K2.1 cmt. n.1. Therefore, the question of whether it would be error to apply the enhancement under § 2K2.1(a)(2) in this case likely rises and falls with the analysis of whether it would be error to apply the career offender guideline. In any event, because our reasons for finding the application of the career offender guideline harmless apply equally to any erroneous application of this guideline in this case, we need not address its application here any further.

Fulcar acknowledges that if his unconditional pleas to his federal convictions that were based on evidence that was seized during the search of his home were knowing and voluntary, then he is barred from challenging those convictions on appeal based on the denial of his motion to suppress the evidence obtained during that search.[3]  He contends, however, that he is not so barred because the District Court did not comply with Rule 11 of the Federal Rules of Criminal Procedure.  He contends that the District Court did not do so because it failed to ensure that, in entering those guilty pleas, he understood that he was waiving his ability to appeal the denial of his motion to suppress.

Fulcar concedes that he did not advance this argument below.  As a result, our review of the asserted error is only for plain error.  See United States v. Williams, 48 F.4th 1, 5 (1st

---

[3] Fulcar does not specify which of the three counts to which he pleaded guilty he is arguing would be invalidated by a finding that the District Court erred in failing to inform him that he could not appeal the motion to suppress if he entered unconditional pleas.  However, Fulcar bases his challenge to the voluntariness of his pleas on not being informed that he would be unable to appeal the denial of his motion to suppress the evidence seized during a search of his home.  Given that the evidence seized from his home -- drugs, a firearm, and ammunition -- formed the basis of count one, which charged him with being a prohibited person in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1), and count three, which charged him with possession with intent to distribute certain drugs in violation of 21 U.S.C. § 841(a)(1) based on the drugs found in his home, we read this first challenge to only be aimed at his guilty pleas to those counts.

Cir. 2022) ("We review an unpreserved Rule 11 claim for plain error." (citing United States v. Vonn, 535 U.S. 55, 58-59 (2002))).

"To establish plain error," Fulcar must show "that (1) an error occurred; (2) the error was clear or obvious; (3) the error affected [the appellant's] substantial rights; and (4) the error seriously affected the fairness, integrity or public reputation of the judicial proceedings." United States v. Kitts, 27 F.4th 777, 784 (1st Cir. 2022) (citation modified). Fulcar has not shown plain error here.

Generally, Federal Rule of Criminal Procedure 11 "defines the contours of the plea hearing" and ensures that a defendant enters his plea knowingly and voluntarily by requiring the district court to inform the defendant of the rights that he is waiving by pleading guilty. Williams, 48 F.4th at 6; see also Fed. R. Crim. P. 11(b). Fulcar acknowledges that Rule 11 "does not expressly state that the defendant has to be advised of the right to appeal a motion to suppress only through a conditional plea." However, he insists that, even if Rule 11 does not require such a warning, "due process requires that the plea amount to a voluntary and intentional relinquishment of a known right." (Quoting United States v. Cotal-Crespo, 47 F.3d 1, 4 (1st Cir. 1995) (citation modified).)

Fulcar points to no precedent suggesting that, as far as the knowing and voluntary entry of a guilty plea is concerned, due

- 9 -

process imposes requirements beyond those provided by Rule 11. See United States v. Romero, 906 F.3d 196, 207 (1st Cir. 2018) (finding defendant could not show supposed error was clear or obvious because he had "no binding precedent on his side"). Moreover, we have previously linked Rule 11 to the requirements of due process. See Cotal-Crespo, 47 F.3d at 4. And, in Williams, we described the "core concerns" of Rule 11 as there having been "a lack of coercion" in the defendant's decision to plead guilty, "the defendant's understanding of the charges against him, and the defendant's 'knowledge of the consequences of the guilty plea.'" 48 F.4th at 6 (quoting Cotal-Crespo, 47 F.3d at 4). We also declined in that case "to add a new core concern to that list -- namely, that the defendant must understand that by proceeding he would be waiving the right to challenge the seizure of evidence." Id. (citation modified).

It follows that Fulcar has not shown that the District Court plainly erred by failing to inform him that his unconditional guilty pleas barred him from challenging the denial of his motion

to suppress.[4]  And so, his challenge to his convictions based on that failure necessarily falls short.[5]

## III.

Fulcar separately challenges his § 922(g)(1) conviction on the grounds that the District Court erred by denying his motion to dismiss the count of the indictment that charged him with violating that statute.  He does so based on New York State Rifle & Pistol Association, Inc. v. Bruen, 597 U.S. 1 (2022).  He argues

---

[4] In his opening brief, Fulcar noted that "[s]ubstantial briefing and a lengthy motion to suppress argument was held." During oral argument, Fulcar emphasized the "unique nature" of this case and seemed to argue it stemmed from the "very extensive" motion to suppress litigation that preceded the guilty pleas.  To the extent Fulcar meant to argue that the lengthy motion to suppress litigation counsels in favor of finding the District Court plainly erred by not specifically advising him he could not appeal the outcome of the motion, he failed to point to any case law -- either in his brief or during oral argument -- to support that contention.  That plain-error argument therefore also fails. See, e.g., United States v. Correa-Osorio, 784 F.3d 11, 21 n.12 (1st Cir. 2015) (explaining that prevailing on plain error requires clear and binding precedent).

[5] Fulcar separately advances a claim of ineffective assistance of counsel based on his counsel's asserted failure to inform him that the entry of his guilty plea would preclude him from appealing the denial of his suppression motion.  However, we will address on direct appeal a claim of ineffective assistance only in the rarest of cases.  See, e.g., United States v. García-Pastrana, 584 F.3d 351, 388 (1st Cir. 2009) ("[T]he proper vehicle for relief for ineffective assistance of counsel is a motion under 28 U.S.C. § 2255, not direct appeal.").  In the alternative, Fulcar asks us to "remand to the district court for a factual hearing on the matter."  We do not think this case calls for such a discretionary remand, either.  See United States v. Colon-Torres, 382 F.3d 76, 85 (1st Cir. 2004) (limiting remand to situations where the record "contain[s] sufficient indicia of ineffectiveness in the plea agreements, the PSR, and the transcripts of the change of plea and sentencing hearings").

that, under that precedent, § 922(g)(1) violates the Second Amendment both on its face and as applied to him, because "[p]ossessing a firearm within the home is a core right protected by the Second Amendment," and "[f]or these reasons and the arguments set forth in detail in" his motion to dismiss filed below, the § 922(g)(1) count should have been dismissed. (Citing District of Columbia v. Heller, 554 U.S. 570, 626-30 (2008).)

As we have explained before, however, incorporating by reference as a practice "has been 'consistently and roundly condemned,' and any incorporated argument is ordinarily deemed forfeited." United States v. Orrego-Martinez, 575 F.3d 1, 8 (1st Cir. 2009) (per curiam) (citation omitted) (quoting Gilday v. Callahan, 59 F.3d 257, 273 n.23 (1st Cir. 1995)); see also Sleeper Farms v. Agway, Inc., 506 F.3d 98, 104 (1st Cir. 2007) ("They purport to incorporate by reference their motion before the district court. That is not acceptable: this court will only consider arguments made before this court; everything else is deemed forfeited." (citation modified)). And while Fulcar does slightly more than simply incorporate his briefing before the District Court, he fails to develop any argument as to why Bruen or Heller renders § 922(g)(1) unconstitutional. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (noting the "settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are

deemed waived"). Significantly, Fulcar does not address the District Court's primary reason for denying his motion to dismiss: United States v. Torres-Rosario, the First Circuit precedent that the District Court determined foreclosed his motion and survived the Supreme Court's Bruen decision. See 658 F.3d 110 (1st Cir. 2011); cf. Sparkle Hill, Inc. v. Interstate Mat Corp., 788 F.3d 25, 30 (1st Cir. 2015). We therefore deem waived any argument that the District Court's ruling on this issue was in error.

## IV.

Fulcar's challenges to his sentences concern the District Court's application of three sentencing enhancements that the Guidelines set forth. We review the District Court's interpretation and application of the Guidelines de novo and its fact-finding for clear error. See United States v. Carvajal, 85 F.4th 602, 609 (1st Cir. 2023) (quoting United States v. Ruiz-Huertas, 792 F.3d 223, 226 (1st Cir. 2015)). If the District Court's alleged error in applying the Guidelines did not affect the ultimate sentence imposed, then we may affirm the sentence on that basis alone. See United States v. Marsh, 561 F.3d 81, 86 (1st Cir. 2009).

## A.

We begin with Fulcar's challenge to the District Court's application of the career offender guideline, which in Fulcar's

case yields an offense level of thirty-two. U.S.S.G. § 4B1.1(b)(3). That Guideline, in relevant part, applies when "the defendant has at least two prior felony convictions of . . . a controlled substance offense." U.S.S.G. § 4B1.1(a)(3). The Guidelines define, in relevant part, a "controlled substance offense" as "an offense under federal or state law" that "prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense." Id. § 4B1.2(b)(1) (emphasis added).

As we noted at the outset, the District Court expressly stated that it would have imposed the same sentence even if it had "accepted" Fulcar's arguments "about what the advisory guideline sentencing range should be." Any error in the Guidelines calculation would, then, be harmless. See United States v. Ouellette, 985 F.3d 107, 110 (1st Cir. 2021) ("[W]e have consistently held that when a sentencing court makes clear that it would have entered the same sentence regardless of the Guidelines, any error in the court's Guidelines calculation is harmless."). But the government makes no argument to us that we must reject Fulcar's challenge to the application of the career offender guideline -- or any guideline -- on that basis. Indeed, the government does not even cite the portion of the sentencing hearing

- 14 -

during which the District Court states that it "would have still reached the same sentence" irrespective of whether it found that the career offender guideline or any other guideline at issue applied to Fulcar.  Rather, the government urges us to address the question of whether the career offender guideline applies head-on, and so, the government necessarily contemplates that it might receive an adverse ruling on that question.

Often, of course, when the record reveals that an asserted error is harmless, it makes sense to bypass the question of whether such an error occurred.  But that is not our invariable practice, and here, because the government neither asks us to affirm the sentence based on the asserted error having been harmless nor even identifies the basis in the record for affirming the sentence because that claimed error was harmless, we think it prudent to resolve the question about whether there was error that the government has asked us to resolve.

The issues have been thoroughly briefed and so we have full adversarial testing.  It is also a question of pure law.  In addition, resolving this issue will provide clarity on a recurring issue of sentencing -- and so one that inevitably bears on plea negotiations -- in which the current state of our case law is less than clear.  See United States v. Soto-Sanchez, 138 F.4th 81, 90 (1st Cir. 2025).

Thus, although, as we will explain, we ultimately conclude that Fulcar's challenge to the application of the career offender guideline to him fails on harmless error grounds, we first assess his contention that the District Court did err in applying that Guideline enhancement to him. And, as we also will explain, we agree with Fulcar that the District Court did so err.

### 1.

The parties agree that the career offender guideline's enhancement applies only if Fulcar's 2008 Massachusetts law conviction for the offense of possession of cocaine with intent to distribute qualifies as a conviction for a "controlled substance offense" within the meaning of that Guideline. Fulcar contends that the enhancement does not so apply because the substance that he was convicted in 2008 of possessing with intent to distribute -- which Massachusetts law deemed to be "coca leaves" or a derivative thereof, and which the parties refer to as "cocaine" -- is not a "controlled substance" within the meaning of the career offender guideline. As we will explain, we agree with Fulcar.

### 2.

The Massachusetts Controlled Substances Act ("MCSA") identifies various substances as "controlled substances," and it then assigns each of those substances to a "class" that is identified by a letter. See Mass. Gen. Laws ch. 94C, § 31. The

MCSA classifies "[c]oca leaves" and their derivatives as Class B substances, id. § 31(Class B)(a)(4); as noted above, the parties refer to such substances as "cocaine," and we do the same for ease of reference.[6] At the time of Fulcar's 2008 conviction, the MCSA defined that substance -- in relevant part -- to include "ecgonine," which the parties agree includes its derivative: [$^{123}$I]ioflupane ("ioflupane"). Id. § 31(Class B)(a)(4) (2008).

Federal law has its own statute, the Controlled Substances Act ("CSA"), that identifies various substances as "controlled substances."[7] 21 U.S.C. §§ 801-904. Rather than assigning each such substance to a class identified by a letter, however, the CSA assigns each one to a "schedule" that is identified by a roman numeral. Id. § 802(6). Like the MCSA, the CSA also labels as a controlled substance -- under Schedule II -- "[c]oca leaves" and their derivatives, which the parties refer to simply as "cocaine." Id. § 812 (Schedule II)(a)(4). At the time of Fulcar's 2008 Massachusetts law conviction, Schedule II of the CSA, like the MCSA, defined this group of

---

[6] Mass. Gen. Laws ch. 94C, § 32A sets out the terms of imprisonment for possession with intent to distribute a Class B substance.

[7] The CSA defines a "controlled substance" as "a drug or other substance, or immediate precursor, included in schedule I, II, III, IV, or V of part B of this subchapter." 21 U.S.C. § 802(6). Part B then goes on to list the five schedules and the corresponding drugs. Id. § 812.

- 17 -

substances to include derivatives of ecgonine, such as ioflupane. 21 C.F.R. § 1308.12(b)(4)(ii) (2008).

As a result, in 2008, when Fulcar was convicted under Massachusetts law of the offense of possession with intent to distribute a controlled substance, that conviction clearly was for an offense that involved "cocaine" under both Massachusetts and federal law. In 2015, however, things changed. That year, Schedule II of the CSA was amended to exclude "ioflupane" from the definition of "cocaine." That substance thus was excluded as of that time from being a "controlled substance" under the CSA. 21 C.F.R. § 1308.12(b)(4)(ii) (Sept. 11, 2015); Schedules of Controlled Substances: Removal of [Ioflupane] From Schedule II of the Controlled Substances Act, 80 Fed. Reg. 54715, 54717 (Sept. 11, 2015). And that exclusion persisted through the time of Fulcar's sentencing for his three federal convictions at issue in this appeal, even though the MCSA continued to define "cocaine" to include ioflupane.

According to Fulcar, ioflupane's exclusion in 2015 from Schedule II, given that it persisted through the time of his sentencing for his federal convictions, means that his 2008 Massachusetts law conviction is not a conviction for a "controlled substance offense" under the career offender guideline. Fulcar reasons as follows.

Fulcar begins by arguing that we must apply what is known as the categorical approach to determine if his assertedly qualifying prior conviction -- his 2008 Massachusetts law conviction -- is for a "controlled substance offense" under the career offender guideline. Under that approach, we must presume that this prior conviction "rested upon nothing more than the least of the acts criminalized by the statute of conviction." Thompson v. United States, 64 F.4th 412, 419 (1st Cir. 2023) (citation modified). And, under that same approach, we may determine what those acts are solely by focusing on "the elements of the [assertedly qualifying predicate] crime -- i.e., the constituent parts of the crime's legal definition (the things the prosecution must prove beyond a reasonable doubt to sustain a conviction) -- and not how a given defendant actually perpetuated [that] crime." United States v. García-Cartagena, 953 F.3d 14, 18 (1st Cir. 2020) (citation modified).

Thus, Fulcar reasons that we must presume that his 2008 Massachusetts law conviction was for the offense of possession with intent to distribute ioflupane, regardless of whether, in committing the underlying offense, he actually possessed that substance rather than a different one that the MCSA also deemed to be "cocaine" but that the CSA did not exclude from its definition of "cocaine" at the time of his federal sentencing for his three federal convictions. As a result, Fulcar argues that we must

- 19 -

presume that he was convicted of possession with intent to distribute a substance that, as of the time of his sentencing for those three federal convictions, was not, per the CSA, "controlled" under federal law.

The government does not disagree with Fulcar's arguments concerning the categorical approach. But Fulcar's challenge to the application of the career offender guideline also depends on two additional steps in his argument about what qualifies as a "controlled substance" under that Guideline, each of which the government does dispute.

The first of those steps concerns the body of law -- state or federal -- under which a substance must be "controlled" to qualify as a "controlled substance" within the meaning of the career offender guideline. Fulcar contends that the Guideline directs us to conclude that a substance is so "controlled" only if it is "controlled" by federal law -- even when, as in his case, the assertedly qualifying prior conviction is for a state offense.

The second of those steps concerns the time for determining whether a substance is controlled. Here, Fulcar contends that the career offender guideline directs us to look at the time that the career offender guideline is applied to the defendant -- and thus, in his case, to the time that he was sentenced for the three federal convictions at issue in this

appeal. In other words, he contends that the Guideline directs us not to look at any other time, such as the time of conviction for the alleged predicate crime, which in his case would have been 2008, when he was convicted of the assertedly qualifying Massachusetts law offense.

The government does not dispute that if Fulcar is right about these last two steps in his argument, then his 2008 Massachusetts law conviction is not a conviction for a "controlled substance offense" under the career offender guideline. The government acknowledges that, at the time of Fulcar's sentencing for his three federal convictions at issue in this appeal, the body of law that defined the substances that were "controlled" under federal law did not define ioflupane to be such a substance.

The government contends, however, that, in the case of an assertedly qualifying prior state law conviction, a "controlled substance" under the career offender guideline includes substances that are controlled under the law of the relevant state, whether or not those substances are also controlled under federal law. Thus, the government argues, even if Fulcar is right about the career offender guideline's time-of-federal-sentencing temporal orientation, Fulcar's 2008 Massachusetts law conviction is still a conviction for a "controlled substance offense" under the career offender guideline. And that is so, according to the government, because Massachusetts, per the MCSA, "controlled" ioflupane not

only when Fulcar's 2008 conviction was entered but also up through the time that Fulcar was sentenced for his federal convictions, which is the time when that Guideline was applied to him.

The government also contends that, even if we must look only to the body of law that defines what substances the federal government controls, we still must look to that body of law as it stood at the time of the entry of the assertedly qualifying prior conviction and not at the time of the career offender guideline's application. The government then contends that we must therefore look to 2008, when Fulcar was convicted under Massachusetts law, and not to when he was sentenced for the three federal convictions at issue in this appeal. Thus, the government argues, even on Fulcar's understanding of what the relevant body of law is that determines whether a substance is "controlled," Fulcar's 2008 conviction is still a conviction for a "controlled substance offense" under the career offender guideline. And that is because, as the government points out, even Fulcar agrees that in 2008, ioflupane was "controlled" under federal law.

During oral argument, the government urged us to revisit our precedent that bears on the temporal point. See United States v. Abdulaziz, 998 F.3d 519, 523 (1st Cir. 2021) (adopting a time-of-federal-sentencing approach to the definition of "controlled substance offense" under the Guidelines). It contends that the "core" and "sole" reasoning on which that precedent relied

has been rejected by an intervening Supreme Court case. See Brown v. United States, 602 U.S. 101, 123 (2024) (adopting a time-of-prior-offense approach to the definition of "serious drug offense" under the Armed Career Criminal Act, 18 U.S.C. § 924(e)(2)(A)(ii)).

We agree with the government that there is a need to clarify our law in this area. We therefore begin with the temporal-orientation issue. As we will explain, however, we conclude that Fulcar has the better of that argument. We then address the government's contention about the body of law that defines what substances are controlled -- as here, too, our law would benefit from clarification. And here, too, we conclude that Fulcar has the better of the argument. Thus, we conclude that Fulcar is right that the District Court erred by subjecting him to the career offender guideline's enhancement. Nonetheless, as we will explain, we still must reject his challenge to his sentences insofar as that challenge is based on that error because we conclude that the error was harmless.

**3.**

Starting with the temporal-orientation issue, the government acknowledges that a panel of this court held in Abdulaziz that in applying an enhancement applicable when an offense was committed "subsequent to sustaining at least two felony convictions of either a crime of violence or a controlled substance

- 23 -

offense," "we must look to the version of those drug schedules that were 'in effect'" at the time of sentencing for the federal offense.[8]  998 F.3d 519, 521, 523 (1st Cir. 2021) (quoting United States v. Rodriguez, 630 F.3d 39, 42 (1st Cir. 2010)).  The government contends, however, that the Supreme Court's subsequent decision in Brown, which addressed a similar timing issue under the Armed Career Criminal Act ("ACCA"), undermines Abdulaziz.  As a result, the government argues, Brown strips Abdulaziz of its controlling force under the law of the circuit doctrine.  See United States v. Guzmán, 419 F.3d 27, 31 (1st Cir. 2005) (describing instances in which "authority that postdates the original decision, although not directly controlling, may nevertheless offer a compelling reason for believing that the former panel, in light of new developments, would change its collective mind").

In the government's view, Abdulaziz's rationale depended on the assumption that ACCA itself was oriented forward to the time of federal sentencing rather than backward to the time of the assertedly qualifying predicate conviction.  See Abdulaziz, 998 F.3d at 526-27.  But, the government points out, Brown held the

_____

[8] Although Abdulaziz concerned a different Guidelines enhancement, U.S.S.G. § 2K2.1(a), the applicability of that enhancement -- and the court's reasoning -- turned on § 4B1.2(b)'s definition of "controlled substance," the same provision we interpret here.  United States v. Abdulaziz, 998 F.3d 519, 523 (1st Cir. 2021).

- 24 -

opposite based on its determination that "ACCA is a recidivist statute that gauges what a defendant's 'history of criminal activity' says about his or her 'culpability and dangerousness.'" Brown, 602 U.S. at 111 (quoting McNeill v. United States, 563 U.S. 816, 823 (2011)). In that regard, the government points out that the Court explained in Brown that the "history of criminal activity" with which ACCA is concerned "does not 'cease to exist' merely because the crime was later redefined." Id. at 113-14 (quoting McNeill, 563 U.S. at 823).

The government is right that Abdulaziz treated the timing question that the career offender guideline poses as "analogous to the question of what ACCA's criteria were for determining what constituted 'a serious drug offense.'" 998 F.3d at 526. Moreover, we explained in Abdulaziz that "there is nothing . . . strange about looking to federal law as it exists at the time of a defendant's federal sentencing to determine the criteria that a potentially applicable federal sentencing enhancement uses to determine whether the enhancement must be applied at that sentencing." Id. at 527.

Abdulaziz did offer other reasons for its resolution of the timing issue. Id. at 528-29. Nonetheless, we assume without deciding that, given Brown, Abdulaziz's rationale no longer holds up. Accordingly, we consider the timing issue afresh. But, as we will next explain, we still conclude that the appropriate temporal

focus under the career offender guideline is the time of the defendant's federal sentencing and not the time of the defendant's assertedly qualifying prior conviction.

**a.**

Brown did explain that ACCA's temporal orientation was backward to the time of the prior conviction because ACCA was an anti-recidivist statute. See 602 U.S. at 111. But that was not the whole of Brown's reasoning.

In response to one of the arguments by the defendants for why ACCA must be construed to be oriented to the time of the measure's application at federal sentencing, Brown addressed what is known as the reference canon. 602 U.S. at 115-16. It explained that, per that canon, "a reference 'to another statute by specific title or section number' . . . 'in effect cuts and pastes the referenced statute as it existed when the referring statute was enacted, without any subsequent amendments.'" Id. at 116 (quoting Jam v. Int'l Fin. Corp., 586 U.S. 199, 209-10 (2019)). By contrast, the Court explained, in accord with that same canon, a reference to "general law" "incorporates the law on that subject as it exists whenever a question under the statute arises." Id. (emphasis omitted) (quoting Jam, 586 U.S. at 209).

Brown then rejected the defendant's contention that ACCA's express reference to section 102 of the CSA was a reference to "general law" for purposes of the reference canon. Id. Rather,

- 26 -

Brown explained, "it is hard to see the phrase 'as defined in section 102 of the Controlled Substances Act,'" 21 U.S.C. § 802, "as anything but a specific reference." 602 U.S. at 116 (quoting 18 U.S.C. § 924(e)(2)(A)(ii)); see also 21 U.S.C. § 802(6) ("The term 'controlled substance' means a drug or other substance . . . included in schedule I, II, III, IV, or V of part B of this subchapter.").

Thus, Brown determined that, precisely because of ACCA's express cross-reference to the CSA, the reference canon did not support the defendant's argument that ACCA was oriented forward to the time of sentencing rather than backward to the time of the assertedly qualifying predicate conviction. 602 U.S. at 116. Unlike ACCA, however, the career offender guideline does not make express reference to the CSA. See U.S.S.G. § 4B1.1(a)(3). It instead refers only generally to a "controlled substance."[9] Id.; see also id. § 4B1.2(b). Brown therefore suggests that the reference canon points in favor of construing the phrase "controlled substance" in the career offender guideline to take on the meaning of that phrase under the general body of law to which that phrase refers at the time that the question about the phrase's meaning arises rather than at any earlier time.

_____

[9] Although § 4B1.2(b)'s definition of "controlled substance offense" does expressly reference two provisions from the United States Code out of the CSA, 46 U.S.C. §§ 70503(a) and 70506(b), those express references are not at issue in this case.

- 27 -

The Fifth Circuit has reached this same conclusion in the wake of Brown.[10]  See United States v. Minor, 121 F.4th 1085, 1090-92 (5th Cir. 2024).  It explained that, under the reference canon, "a statute that refers to another statute by specific title or section number in effect cuts and pastes the referenced statute as it existed when the referring statute was enacted, without any subsequent amendments."  Id. at 1090 (quoting Jam, 586 U.S. at 209-10).  It therefore concluded that the Guidelines' inclusion of only the general term "controlled substance" rather than an

---

[10]  Other circuits that have considered this question post-Brown have reached the opposite conclusion.  However, those cases do not consider how the reference canon influences the interpretation of the Guidelines as compared to ACCA.  Those cases also opted to follow pre-Brown circuit precedent that held the relevant reference point was the time of conviction for the predicate crime and did not read Brown as requiring those precedents to be overturned.  See, e.g., United States v. Nelson, 151 F.4th 577, 583 (4th Cir. 2025) (reading Brown as "leaving [them] free to decide between [the time-of-sentencing] approach and the time-of-conviction approach" and "recogniz[ing] that such determination was long ago made by [their] court" in favor of the "time-of-conviction approach"); United States v. Drake, 126 F.4th 1242, 1245-46 (6th Cir. 2025) (declining to read a footnote in Brown distinguishing between ACCA and the Guidelines as allowing the court to depart from pre-Brown circuit precedent that adopted the time-of-conviction approach (citing Brown v. United States, 602 U.S. 101, 120 n.7 (2024) (explaining that "there is reason to doubt that the Guidelines practice is relevant" to ACCA "because Congress has expressly directed courts to apply the Guidelines in effect on the date the defendant is sentenced" while "ACCA contains no similar instruction" (citation modified)))); United States v. Piett, No. 23-13197, 2025 WL 2156749, at *3 (11th Cir. July 30, 2025) ("We conclude that Piett's argument is foreclosed by . . . our prior holding that a controlled substance under § 4B1.2(b)'s definition of 'controlled substance offense' is, for prior state offenses, a drug regulated by state law at the time of the conviction.").

- 28 -

explicit cross-reference to the CSA "weighs in favor of applying the definition of that term as it exists whenever a question under the statute arises -- i.e., sentencing for the instant offense," and not the date of the predicate conviction. Id. (citation modified). And so, the Fifth Circuit explained, precisely because of ACCA's cross-reference to the CSA, "the reference canon operated differently in Brown than it does" in the context of the career offender guideline.[11] Id. at 1092.

Of course, the career offender guideline, like ACCA, is concerned with recidivist behavior. So, in that respect, the career offender guideline could be understood, like ACCA, to be a "recidivist" measure "that gauges what a defendant's 'history of criminal activity' says about his or her 'culpability and dangerousness.'" Brown, 602 U.S. at 111 (quoting McNeill, 563 U.S. at 823). For that reason, the career offender guideline could be thought to be similarly aimed at tying the sentencing

_____

[11] We note that there was a dissent in Minor. See 121 F.4th 1085, 1094 (5th Cir. 2024) (Duncan, J., dissenting). In addition to raising the contentions we respond to in this opinion, the dissent argued that "a time-of-sentencing approach would yield absurd results," because two defendants with the same predicate conviction sentenced on either side of a change to the CSA would render one a career offender, but not the other. Id. at 1095 (quoting United States v. Lewis, 58 F.4th 764, 772 (3d Cir. 2023)). As we have explained, however, "this kind of differential treatment between otherwise similarly situated defendants often arises when courts apply -- as they ordinarily must -- the Guidelines that are operative at the time of sentencing." Abdulaziz, 998 F.3d at 529. We fail to see how such an ordinary differential would be an absurd result.

enhancement that it sets forth to the defendant's behavior as it was viewed in the eyes of the law at the time that the defendant was convicted of the predicate crime.

However, the Guidelines account for a defendant's history of criminal activity even when those past convictions do not qualify as predicate crimes under the career offender guideline in the calculation of a defendant's Criminal History Category. See, e.g., U.S.S.G. § 1B1.1(a)(6). Nor is it otherwise clear that the United States Sentencing Commission ("Commission"), in promulgating the career offender enhancement, has chosen to focus on the inherent danger of lawbreaking over the danger Congress assigns to specific drugs.

Furthermore, we do not understand Brown to hold that a measure's anti-recidivist purpose is in and of itself necessarily dispositive of its temporal reference point. Instead, as Brown acknowledged, "[t]he reference canon can be a helpful tool." 602 U.S. at 116. And, as we have already explained, the reference canon points in a different temporal direction in the context of the career offender guideline than it does in the context of ACCA precisely because the career offender guideline does not have an express cross-reference to the CSA or any other federal measure defining what a controlled substance is. Instead, it references only a general term, "controlled substance."

Notably, in analyzing how the reference canon applies to ACCA, Brown did not explain why, despite the express cross-reference to the CSA, ACCA was oriented to the time of the prior conviction rather than, per the reference canon, the time of ACCA's enactment of the cross-reference. Cf. id. (acknowledging that a specific reference, like the one in ACCA, "in effect cuts and pastes the referenced statute as it existed when the referring statute was enacted, without any subsequent amendments," without explaining why it was rejecting that reference point (quoting Jam, 586 U.S. at 209-10)). Nor did it directly address the import of the fact that the CSA itself operates through schedules that may be changed administratively. See 21 U.S.C. § 811 (explaining the Attorney General's authority to modify the drug schedules). Thus, we do not understand Brown to hold that the reference canon is not helpful, even when triggered, in construing any measure that has an anti-recidivist purpose.

We also note that the Commission's choice not to make the kind of express reference that Congress made in ACCA aligns with the fact that, as Brown itself pointedly recognized, the Guidelines are oriented toward the time of their application rather than any earlier time. Indeed, in distinguishing the Guidelines from ACCA, Brown explained that "there is reason to doubt that the Guidelines practice is relevant here . . . because Congress has expressly directed courts to apply the Guidelines 'in effect on

- 31 -

the date the defendant is sentenced'" while "ACCA contains no similar instruction." 602 U.S. at 120 n.7 (quoting 18 U.S.C. § 3553(a)(4)(A)(ii)); see also Minor, 121 F.4th at 1092 ("Because ACCA and the Guidelines differ in key ways . . . we understand that Brown does not dictate the outcome in the case before us.").

**b.**

For all these reasons, we conclude, like the Fifth Circuit, that the term "controlled substance" in the career offender guideline is a reference to a general body of law defining what the substance is that can change over time.[12] Accordingly, we conclude that the term takes its meaning from the way that term is defined at the time of the career offender guideline's application to the defendant -- and so at the time of his sentencing for the underlying federal offenses.[13]

---

[12] We also note that this interpretation of the career offender guideline is not contrary to our interpretation of section 237(a)(2)(B)(i) of the Immigration and Nationality Act, which makes "[a]ny alien who at any time after admission has been convicted of a violation of . . . any law or regulation of a State . . . relating to a controlled substance (as defined in section 802 of Title 21) . . . deportable," as adopting a time-of-conviction approach. 8 U.S.C. § 1227(a)(2)(B)(i). That measure, like ACCA, contains an express cross-reference to the CSA. See Dor v. Bondi, 161 F.4th 1, 3 (1st Cir. 2025) (noting that § 1227(a)(2)(B)(i) "references the federal definition of a 'controlled substance,' as defined by the [CSA] at 21 U.S.C. § 802").

[13] We note that when the sentencing guideline in question changes between the commission of the federal offense and sentencing for the federal offense such that the career offender guideline then would apply even though it would not have applied

**4.**

We come, then, to the government's contention about the body of law that determines whether a substance is a "controlled substance" under the career offender guideline. That question concerns whether that body of law is only federal or instead is either state or federal law. As with the temporal issue, we -- and other circuits -- have addressed this issue before.

Seven circuits have found that in the case of a predicate state offense either state or federal law can define what constitutes a "controlled substance" under the Guidelines. See United States v. Lewis, 58 F.4th 764, 769 (3d Cir. 2023); United States v. Ward, 972 F.3d 364, 374 (4th Cir. 2020); United States v. Jones, 81 F.4th 591, 599 (6th Cir. 2023), cert. denied, 144 S. Ct. 611 (2024); United States v. Ruth, 966 F.3d 642, 654 (7th Cir. 2020); United States v. Henderson, 11 F.4th 713, 718 (8th Cir. 2021); United States v. Jones, 15 F.4th 1288, 1292 (10th Cir. 2021); United States v. Dubois, 94 F.4th 1284, 1296 (11th Cir. 2024), vacated on other grounds, 145 S. Ct. 1041, reinstated, 139

_____

at the time the federal offense was committed, we, as is customary, apply the Guideline in effect at the time of the commission of the federal crime. See United States v. Maldonado, 242 F.3d 1, 5 (1st Cir. 2001) ("[W]e ordinarily employ the guidelines in effect at sentencing only where they are as lenient as those in effect at the time of the offense; when the guidelines have been made more severe in the interim, the version in effect at the time of the crime is normally used, as a matter of policy and to avoid any hint of ex post facto increase in penalty." (citing United States v. Harotunian, 920 F.2d 1040, 1041-42 (1st Cir. 1990))).

F.4th 887, 889 (11th Cir. 2025). By contrast, three circuits have determined that "controlled substance" in the Guidelines is defined even with respect to a predicate state offense with reference to federal law exclusively. See United States v. Townsend, 897 F.3d 66, 71 (2d Cir. 2018); United States v. Gomez-Alvarez, 781 F.3d 787, 793-94 (5th Cir. 2015) (interpreting analogous reference to "controlled substance" in the application note to U.S.S.G. § 2L1.2); United States v. Bautista, 989 F.3d 698, 702 (9th Cir. 2021). We join the latter half of this circuit split for the reasons we will next explain.

### a.

In United States v. Crocco, the defendant, like Fulcar, challenged the application of the career offender guideline based on a prior predicate conviction for a violation of a state law prohibiting the possession of what was asserted to be a "controlled substance" under the career offender guideline. 15 F.4th 20, 21 (1st Cir. 2021). That defendant, like Fulcar, also contended that the conviction did not qualify as one for an offense involving a "controlled substance" under that Guideline because the state law offense defined the relevant contraband -- there, marijuana -- to include a substance -- there, hemp -- that was not a "controlled substance" within the meaning of federal law, as reflected in the CSA's drug schedules. Id. at 25.

We explained in Crocco that our review was merely for plain error because the defendant had not preserved the challenge below and observed that the legal question was unsettled in our circuit and that the other courts of appeals were split on the issue. Id. at 27. We further explained that because the case law was unsettled, any error as to whether the career offender guideline referred only to substances controlled under federal law would not have been plain or obvious. Id. at 24.

Nonetheless, we noted that "[b]ecause we [were] interpreting the federal sentencing guidelines and utilizing the categorical approach (a creation of federal case law)," the "federally based approach" advanced by the Second, Fifth, and Ninth Circuits was "appealing." Id. at 23 (referring, respectively, to Townsend, 897 F.3d at 68, 71; Gomez-Alvarez, 781 F.3d at 793-94; Bautista, 989 F.3d at 702). We also explained that "federal courts cannot blindly accept anything that a state names or treats as a controlled substance" without "turn[ing] the categorical approach on its head by defining [a controlled substance] as whatever is illegal under the particular law of the State where the defendant was convicted." Id. (second alteration in original) (quoting Esquivel-Quintana v. Sessions, 581 U.S. 385, 393 (2017)). We pointed out, as well, that resorting to a dictionary to define controlled substance only further begged the question and risked inconsistency based on the chosen dictionary. Id. at 23-24.

The government now asks us to reject the implication of Crocco's dicta. It asks us to hold instead that the career offender guideline is clear in the case of a predicate state offense in referring to a substance that the relevant state controls, even if the federal government does not itself control that substance. We decline to do so.

**b.**

Interestingly, the government appears, in advancing its position on this issue, to emphasize the very point that we concluded undermined its argument about the temporal-orientation issue -- namely, that the career offender guideline, unlike ACCA, does not refer to a specific provision of federal law in referring to a "controlled substance offense." We can see why the government would want to emphasize that feature of the Guideline's text here. If that text did refer to such a provision, then state law could not determine whether a substance is "controlled" for purposes of the career offender guideline.

It does not follow from the fact that the career offender guideline contains no such cross-reference, however, that the government's state-law-inclusive position is right. Of course, just as the term "apple" encompasses all varieties, so, too, one might think, would the term "controlled substance," such that a substance "controlled" by a state would be considered no less a "controlled substance" than a substance "controlled" by the

- 36 -

federal government. But there is good reason for us to reject such an ordinary-meaning-based resolution of the interpretive question given the Supreme Court's decision in Jerome v. United States, 318 U.S. 101 (1943).

There, the Court construed the federal Bank Robbery Act, which provided in relevant part that "whoever shall enter or attempt to enter any bank . . . with intent to commit in such bank or building . . . any felony or larceny, shall be fined not more than $5,000 or imprisoned not more than twenty years, or both." Bank Robbery Act, 12 U.S.C. § 588b (1934) (codified as amended at 18 U.S.C. § 2113). The Court thus had to decide whether the statute, in referring to "any felony," was referring to any such offense under federal or state law or only to any such offense under federal law. See Jerome, 318 U.S. at 102.

One might have thought that, as a matter of plain text, the answer was clear enough, given that the ordinary meaning of the general word "felony" would encompass an offense of that kind under either state or federal law. But the Court rejected that conclusion. Id.

The Court acknowledged that "[a]t times it has been inferred from the nature of the problem with which Congress was dealing that the application of a federal statute should be dependent on state law." Id. at 104. It went on to explain, though, that "we must generally assume, in the absence of a plain

- 37 -

indication to the contrary, that Congress when it enacts a statute is not making the application of the federal act dependent on state law." Id.

The Court explained that this assumption was "based on the fact that the application of federal legislation is nationwide," and it pointed to both a "desirability of uniformity" and the fact that "at times . . . the federal program would be impaired if state law were to control" as reasons to prefer an exclusively federal definition. Id. (first citing United States v. Pelzer, 312 U.S. 399, 402 (1941); and then citing Seaboard Air Line Ry. v. Horton, 233 U.S. 492, 503 (1914)). The Court on that basis adopted a presumption that the Act's use of "felony" referred to federal law only, and the Court then went on to conclude that the Act did not otherwise evince an intent to encompass state offenses sufficient to overcome the presumption. Id. at 106-08.

We see no reason to opt for a different interpretive approach here.[14] Jerome did concern the proper interpretation of

---

[14] Jerome v. United States articulated a third consideration that, in that case, counseled against concluding that "felony" incorporated state law. 318 U.S. 101, 105 (1943). The Supreme Court noted that, given the double jeopardy clause of the Fifth Amendment, "courts should be reluctant to expand" defined offenses "beyond the clear requirements of the terms of the statute" when Congress is "creating offenses which duplicate or build upon state law." Id. The career offender guideline defines a controlled substance offense to include state offenses, thereby negating this concern here. However, there is no indication that the Jerome presumption requires a finding that all of Jerome's considerations

a federal criminal statute rather than a federal sentencing guideline.  Id. at 101-02.  But, in both instances, we are construing the handiwork of a federal lawmaking body in the federal criminal law context.

We also recognize that the career offender guideline, unlike the statute in Jerome, makes clear that it does encompass state law offenses. See U.S.S.G. § 4B1.2(b) ("The term 'controlled substance offense' means an offense under federal or state law . . . .").  But the text of the Guideline merely provides that a "controlled substance offense" is an "offense under federal or state law" that "prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense." Id. (emphasis added).  The career offender guideline thus makes clear that the question is not what constitutes an "offense."  The question is whether the unadorned phrase "controlled substance" is referring to a substance that only the federal government controls or also to one that a state controls.

_____

be present.  Indeed, the Court indicated in Jerome that the double jeopardy consideration simply "g[ave] additional weight" to its holding.  Id.

To that same point, we note that, in many contexts, Congress has chosen to permit state offenses to trigger criminal liability only if they have certain attributes that are defined solely by federal law. See, e.g., 18 U.S.C. § 922(g)(1) (placing criminal restrictions on "any person . . . who has been convicted in any court of, a crime publishable by imprisonment for a term exceeding one year" (emphasis added)). We thus see no reason why the Jerome presumption would not apply as a tool to aid our resolution of what "controlled substance" means here.

**c.**

The government does argue that the Jerome presumption is just a presumption and thus that it "gives way to 'a plain indication' that the application of federal law depends on state law." (Quoting Ward, 972 F.3d at 373-74.) The government then further states that "based on Section 4B1.2(b)'s context and history . . . this Court can be 'confident'" that the Jerome presumption is "overcome." (Quoting Ward, 972 F.3d at 374.) We are not convinced.

The government points out that in 1989, the Commission amended the definition of "controlled substance offense," which was previously defined as "an offense identified in 21 U.S.C. §§ 841, 952(a), 955, 955a, 959; §§ 405B and 416 of the Controlled Substances Act as amended in 1986, and similar offenses." (Quoting U.S.S.G. § 4B1.2(2) (1987).) See also U.S.S.G. App. C, at 138

(1989) (removing the reference to specific United States Code provisions and replacing it with the "controlled substance" language used in the version at issue here). The government then posits that because the Commission removed the cross-reference to the CSA in 1989 from its definition of "controlled substance offense," the absence of a cross-reference in its current definition of "controlled substance offense" implies that a controlled substance is defined with reference to either state or federal law.

The application notes predating the amendment make clear, however, that "an offense identified in [the CSA], and similar offenses," U.S.S.G. § 4B1.2(2) (1987), already included both federal and state offenses. See id. cmt. n.2 ("'Controlled substance offense' means any of the federal offenses identified in the statutes referenced in § 4B1.2, or substantially equivalent state offenses."); see also United States v. Giggey, 551 F.3d 27, 34 (1st Cir. 2008) ("Commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." (citation modified)). The amendment therefore does not address the asserted textual ambiguity at issue.

The question remains, in other words, whether a substance is "controlled" under the Guideline when the substance

in question is controlled by the relevant state or only when it is controlled by the federal government. And, in form, that question is not materially distinct from the question that the Court confronted in Jerome about what constituted a "felony" and to which Jerome applied the presumption in favor of federal law supplying the answer.

The government also points out that the absence of any cross-reference to the provision of federal law that defines controlled substances -- namely, the CSA -- is conspicuous because the Commission has demonstrated the capacity to explicitly cross-reference federal law when it so desires. The government points out in that regard that the Commission incorporates statutory definitions of "firearm" and "explosive material" into § 4B1.2(a)(2). See U.S.S.G. § 4B1.2(a)(2) (referencing 26 U.S.C. § 5845(a) and 18 U.S.C. § 841(c)). Additionally, the government notes that the Commission redefined "crime of violence" to match "nearly verbatim" the definition of "violent felony" in ACCA but chose to not adopt ACCA's definition of "controlled substance offense," which did explicitly reference the CSA. (First citing 18 U.S.C. § 924(e)(2)(B); and then citing id. § 924(e)(2)(A)(ii).) See U.S.S.G. § 4B1.2(a) (defining "crime of violence").

Thus, the government reasons, because the Commission knows how to expressly tie the term "controlled substance" to a provision of federal law, we must infer that the Commission's

- 42 -

choice to not make such a cross-reference is an indication that it intended to refer to a substance that is controlled by either federal or state law. The government then adds that this textual implication is reinforced by the fact that the Guideline's plain terms make clear that the Guideline may be triggered by a state or federal conviction. See U.S.S.G. § 4B1.2(b) (defining "controlled substance offense" as "an offense under federal or state law"). In other words, the government argues, by providing that a state law conviction for a controlled substance offense can trigger the Guideline, the Guideline must look to state law itself to define what constitutes a "controlled substance."

The government overlooks the fact, though, that a specific cross-reference to the federal CSA could have, through the reference canon, tied the application of the career offender guideline to the CSA in effect at the time of the Guideline's enactment. See Jam, 586 U.S. at 209-10 ("[A] statute that refers to another statute by specific title or section number in effect cuts and pastes the referenced statute as it existed when the referring statute was enacted, without any subsequent amendments."). Thus, the absence of a specific cross-reference is not a clear indication that the Commission intended to make the application of the career offender guideline dependent on state law, such that the Jerome presumption is overcome. And while we agree that the word "offense" in the Guideline is plainly inclusive

of a state law offense, given the express inclusion of "an offense . . . under state law," U.S.S.G. § 4B1.2(b), the question of whether a substance must be "controlled" under state or federal law to be a "controlled substance" is not similarly plainly resolved elsewhere in the Guideline.

So, as Congress did in Jerome, the Commission here failed to define the relevant term -- namely, in this case, "controlled substance." And, like in Jerome with respect to states' definitions of "felony" for the federal statute there at issue, the inclusion of states' definitions of "controlled substance" is not necessary to effectuate the career offender guideline. 318 U.S. at 107 ("Finally, the inclusion of state crimes in the word 'felony' neither comports with the scheme of the Act nor is necessary to give the Act meaning and vitality."). Nor is it clear, given the absence of a definition of that term, that the Commission intended for "controlled substance" to sweep up every state's definition of the same. Accordingly, we now make clear what Crocco suggested: "Controlled substance" is defined in reference to federal law, exclusively, and in a way that is easily administered and avoids the inconsistency that could follow from

merely handing over the definition of a "controlled substance" to each state.[15]

**5.**

In sum, we agree with Fulcar that what matters is whether ioflupane was "controlled" by the federal government at the time of his federal sentencing. And, because it was not, we also agree with Fulcar that the District Court erred in applying the career offender guideline to him based on his 2008 Massachusetts law conviction for possession with intent to distribute "cocaine."

Even still, we are not done assessing this ground for challenging Fulcar's sentences. The government does not argue that, insofar as the District Court made an error in applying the career offender guideline's enhancement in sentencing Fulcar, that error did not affect his sentences. But, as we noted in recounting the procedural history, the District Court made it clear that "whether or not [it] had accepted [Fulcar's] arguments about what the advisory guideline sentencing range should be, that is, if

---

[15] We are reasonably confident that the foregoing weighs in favor of reading the Guideline as referring only to substances controlled by federal law. But even if we were left with "a grievous ambiguity or uncertainty," Shaw v. United States, 580 U.S. 63, 71 (2016) (quoting Muscarello v. United States, 524 U.S. 125, 138-39 (1998)), the issue would call for application of the rule of lenity, which "requires a court to resolve true statutory uncertainty in the accused's favor," United States v. Ahlers, 305 F.3d 54, 62 (1st Cir. 2002). See also United States v. Luna-Diaz, 222 F.3d 1, 3 n.2 (1st Cir. 2000) (noting that "the rule of lenity applies" to the interpretation of the Guidelines, by virtue of it being similar to the interpretation of criminal statutes).

[it] had accepted them, [it] would have still reached the same sentence [it was] imposing [t]here, having considered all of the factors under Title 18, United States Code, 3553(a)."

We therefore conclude that although the District Court erred in its application of the career offender guideline, that error was harmless. See, e.g., Marsh, 561 F.3d at 86 ("[T]he district court stated that it would have imposed the same sentence as a non-Guideline sentence under 18 U.S.C. § 3553(a). If we find an alleged Guideline error would not have affected the district court's sentence, we may affirm." (citation omitted)). Accordingly, we see no reason to vacate the sentences based on the District Court's application of the career offender guideline.

**B.**

There remains to address, then, Fulcar's challenges to two other sentencing enhancements, which the District Court suggested would have applied to the calculation of his Guidelines sentencing range for his § 922(g)(1) conviction if not for the already-applied career offender enhancement: the § 2K2.1(a)(2) enhancement and the § 2K2.1(b)(6)(B) enhancement. Fulcar acknowledges that the District Court did not specifically find that these enhancements applied to Fulcar because it determined, due to grouping, that the career offender calculation yielded a higher sentencing range under the Guidelines and drove the range

- 46 -

calculation.  Fulcar nonetheless argues that to the extent that this was a finding, it was clear error.[16]

We need not decide whether this finding, if it was made, was clear error.  As mentioned above, the District Court made clear that even if it had accepted Fulcar's "arguments about what the advisory guideline sentencing range should be," it "would have still reached the same sentence" under 18 U.S.C. § 3553(a).  And given that two of the objections to the Guidelines calculation that Fulcar levied were precisely to the application of enhancements under § 2K2.1(a)(2) and § 2K2.1(b)(6)(B), it is clear the District Court would have imposed the same sentence regardless of its findings on these specific objections.  Thus, this challenge, too, is unavailing.  See Marsh, 561 F.3d at 86.

**V.**

For the foregoing reasons, Fulcar's convictions and sentences are **affirmed**.

---

[16] The § 2K2.1(a)(2) Guideline applies where a § 922(g)(1) defendant has two prior convictions "of either a crime of violence or a controlled substance offense."  Section 2K2.1(a)(2) incorporates the definition of "controlled substance offense" from the career offender guideline we have just analyzed.  U.S.S.G. § 2K2.1 cmt. n.1.  Thus, if not for the harmlessness of the error, we would find that application of § 2K2.1(a)(2) to Fulcar was error for the same reasons given above with respect to the career offender guideline.